William V. WADE, Appellant,

v.

COMMISSION FOR LAWYER DISCIPLINE, Appellee.

No. 01–95–01080–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 7, 1997.

Rehearing Overruled Sept. 16, 1997.

William V. Wade, Houston, Appellant.

Mary Klapperich, Houston, Scott Rothenberg, Bellaire, Linda A. Acevedo, Austin, for Appellee.

Before COHEN, ANDELL and NUCHIA, JJ.

## OPINION

PER CURIAM.

After a non-jury trial, the court entered a judgment of discipline, suspending appellant from the practice of law for 540 days, the first 90 days to be active suspension, and the remainder to be probated subject to various terms and conditions. The probation was later revoked. Appellant appeals both the original judgment and the revocation. We affirm.

### Facts

In 1991, five women asked appellant to represent them in their sexual harassment claims against their former employer. The first woman to meet with appellant, Joan O'Hare, testified she entered into a verbal contingency fee agreement with him providing that he would be compensated at 33⅓ percent of the recovery if the claim was settled before trial, 40 percent if it went to trial, and 45 percent if appeal was filed. She would pay reasonable litigation expenses. Over the next several months, the other women also requested appellant to represent them. O'Hare testified that she requested a written fee contract, but appellant never reduced the agreement with her or any of the other women to writing.

Appellant filed suit on behalf of the women in October 1991, and the case came to mediation on July 2, 1992. The night before, at a meeting held to prepare for the mediation, a dispute arose over the amount of compensation appellant would receive if the case settled. O'Hare testified that appellant said he was entitled to 50 percent of the recovery. Appellant testified that he told the women that if the fees for his services to that point were calculated at the customary rate in Harris County, they would be around $300,000, figured at $200 per hour. He testified

that he pointed out to O'Hare that a one-third percentage would be all right if the settlement were one million dollars, but if it were less, the fee would not be an appropriate percentage to compensate him for all the time he had put into the case. O'Hare testified that she attempted to confirm with appellant their original agreement, but that he dismissed the conversation, saying that they would talk about it later, which did not happen that evening. Appellant testified that that evening, after the plaintiffs conferred as a group, one, Tracy Probst, told appellant that they would not settle the case for less than one million dollars and that they thought, at that point, a 40 per cent fee would be appropriate, to which he consented.

The mediation commenced the next morning at 9:00 and ran until about 3:00 a.m. the next morning. In the afternoon of July 2, one of the women, Cindy Henry, left and gave appellant authority to sign her name for settlement purposes. In the early morning hours of July 3, the four remaining women, with appellant absent, agreed to settle the case for $285,000.

O'Hare testified to the following. Upon learning of the women's agreement to accept the $285,000, appellant became very upset, cried, and told the women he could not believe they were going to betray him in that way. Appellant told them they should not accept the offer. He could not sign the settlement papers because he had withdrawn as their counsel. When he asked what his fee was going to be and O'Hare said 33⅓ percent, he disagreed vehemently and counteroffered that his fee should be the whole settlement amount. None of the clients agreed to that. Appellant said he would not sign the papers unless he got 45 percent, and because of that, O'Hare agreed to that fee.

Appellant testified to the following. Upon reentering the room where the women had been conferring, Probst told him they had developed various scenarios of what a fair attorney's fee would be. The scenarios, contained in appellant's exhibit 16, allowed for expenses of $40,000, plus and fees ranging from 50 percent to 36.5 percent. Appellant told them he did not think the 50 percent

figure fair, but that the 46 percent figure was. At his request, they called Henry. He advised her he did not think it wise to settle for the $285,000, but she agreed to it, and with that the mediation ended.

In August 1992, O'Hare requested appellant provide documentation of the expenses. Sometime thereafter, the women filed grievances against appellant.

On September 15, 1992, Mr. Halbach, an attorney representing the three women, wrote a letter demanding appellant provide, within three days, an accounting of all attorney's fees and expenses, and pay $23,500, the difference between the amount appellant had already remitted to Halbach's clients and what they should have been paid under the 33⅓ percentage O'Hare had testified was the original agreement. In mid-November, the three women, joined by the other two, sued appellant for an accounting of the expenses and the attorney's fees he had paid himself. O'Hare testified that appellant did not provide an accounting until the Friday before they were set for trial in January 1995.

Appellant testified that in September 1992, in response to Probst's request he went through a list of the expenses and estimated them for her, but that nothing was in writing at that time. On November 6, 1992, appellant wrote Halbach, stating that resolution of the accounting was influenced by a probate proceeding,[1] but that he would try to finish it within a couple of days. After the women and defense counsel provided him with releases to avoid concern about breaching the confidentiality provisions of the settlement, appellant provided an accounting of the expenses dated July 30, 1993. At his deposition, appellant produced another accounting dated December 17, 1993. He had difficulty locating the supporting documentation for the accounting because of missing records that he attributed to his wife's activities in connection with their divorce.

Eventually, in 1995, appellant produced sufficient documentation to satisfy the women, and they settled their case against him with no money changing hands. As part of the settlement, the women were tendered affidavits to sign containing the following language:

> I have no desire to see the State Bar of Texas discipline Mr. Wade in any way whether by reprimand, suspension or disbarment, indeed because I want to get on with my life. For this reason I have agreed, as has Mr. Wade, to accept the resolution of disagreement I may have had with him in the past.

O'Hare testified that neither she nor any of the other women signed such an affidavit because it did not reflect the way they felt. Instead, they signed an affidavit that said:

> I do not wish to personally pursue the grievance. However, I am aware that this is no longer my decision but rather the Commission for Lawyer Discipline for the State of Texas. I'm giving this affidavit in connection with my resolution with Mr. Wade and because he was advised by Mr. Ted Halbach the individual filing cannot withdraw such a complaint once the Commission for Lawyer Discipline for the State Bar of Texas has taken action thereon.

O'Hare testified that she did not want to do anything to hinder the Commission from proceeding with its action against appellant.

On July 8, 1994, the State Bar of Texas wrote appellant that the Grievance Committee had concluded that he had engaged in professional misconduct. Appellant refused to accept the committee's settlement offer, and the disciplinary proceeding in the trial court ensued.

O'Hare testified that appellant never told her of the need for a contingency fee contract to be in writing signed by the attorney and the client, for it to state the method for determination of the attorney's fees, or for it to state how expenses would be deducted. This information was important to her to make an informed decision regarding appellant's representation.

Appellant testified that his exhibit 16, although not signed by anyone, was the written fee agreement he had with the women; that it was not signed by anyone, nor required to

---

1. One of the women, LaRain Hopkins, was murdered before the mediation, and the probate court appointed her sister, Fitzpatrick, as the estate's representative.

be; and that it does not say what expenses are to be paid and by whom. He admitted that he had no written agreement with the women up until the night of mediation.

Appellant knew the women were challenging any attorney's fee above 33⅓ percent. He nevertheless paid himself 35 percent to 36 percent of the settlement and did not safekeep the two to three percent of his fee that was in dispute.

Following Halbach's testimony, appellant moved for instructed verdict due to lack of jurisdiction. Appellant contended the court did not comply with sections 2.11–2.13 of the Texas Rules of Disciplinary Procedure,[2] requiring that the Committee make a finding of "just cause." The court denied the motion.

Then, appellant presented an alternative motion for instructed verdict, based on section 3.08(F) of the Texas Rules of Disciplinary Procedure.[3] In it, he argued that because four of the five complainants did not cooperate in the prosecution of the action and all five signed affidavits saying they did not personally wish to pursue the grievance, the action should be dismissed. The court denied that motion.

The judgment suspended appellant for 90 days and for 15 additional months of probated suspension. Appellant moved for new trial and twice requested findings of fact and conclusions of law. No findings of fact or conclusions of law were filed.

Under the same trial court cause number as the original discipline proceeding, the court, on January 29, 1996, signed an order revoking appellant's probation. On May 20, 1996, appellant filed a separate cash bond, presumably in an attempt to perfect an appeal of the order of revocation.

## Motion to Dismiss Second Appeal

Appellee, the Commission for Lawyer Discipline (CLD) has moved to dismiss the second appeal on the ground that appellant's cash bond was untimely filed. The motion is denied.

## Analysis of Points of Error

### A. Motion for Directed Verdict

In his first point of error, appellant contends that the judge erred in denying his motion for directed verdict because CLD never produced any evidence that a finding of "just cause" had been made.

### 1. Standard of Review.

■ Appellant's motion was a request that the trial court render judgment as a matter of law that CLD had to plead and prove, as a prerequisite for the court's jurisdiction, that the Grievance Committee's investigatory committee had made a finding of just cause. We review the trial court's interpretation and application of law *de novo*. *See Carrasco v. Texas Transp. Inst.*, 908 S.W.2d 575, 576 (Tex.App.—Waco 1995, no writ).

### 2. Analysis

■ Under section 2.11 of the Texas Rules of Disciplinary Procedure (TRDP), the Grievance Committee appoints an investigatory committee to determine whether there is just cause for the complaint. TEX.R. DISCIPLINARY P. 2.11. If the committee finds just cause, it is to notify the attorney so that he can elect to have the complaint heard by a district court of proper venue or by an evidentiary panel appointed by the Chair of the Grievance Committee.[4] TEX.R. DISCIPLINARY P. 2.13–2.14. Nothing in these rules, however, specifically requires that the CLD must plead and prove that there was a finding of just cause. TEX.R. DISCIPLINARY P. 3.01(G)[5] does provide that "any other matter that is required or may be permitted by law or by these rules" must be included in the petition.

By the time a complaint reaches the district court, the other provisions like sections 2.11 and 2.13 have assured that the finding of just cause has already been made. That is

---

2. TEX.R. DISCIPLINARY P. 2.11–2.13 *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A–1 (Vernon Pamph. 1997).

3. TEX.R. DISCIPLINARY P. 3.08.

4. This assumes the attorney does not negotiate a settlement of the complaint pursuant to rule 2.13.

5. TEX.R. DISCIPLINARY P. 3.01(G).

what happened in this case. Attached to appellant's motion for directed verdict is a July 8, 1994 letter to appellant from the Office of Chief Disciplinary Counsel stating:

> After considering all of the evidence and testimony presented in the above referenced complaint, the Committee has concluded that you engaged in professional misconduct in violation of Disciplinary Rules.

While this language does not use the words, "just cause," it shows the investigatory committee made such a finding. It is sufficient evidence to show that such a finding was made.

We overrule the first point of error.

**B. Alternative Motion for Directed Verdict**

■ In point of error two, appellant contends the judge erred in denying his alternative motion for directed verdict. We follow the standard of review stated under point of error one.

> Appellant cites the language of TEX.R. DISCIPLINARY P. 3.08(F):
>
> The unwillingness or neglect of a Complainant to sign a Complaint or to assist in the prosecution of a Disciplinary Action, or a compromise and settlement between the Complainant and the Respondent, does not alone justify the abatement or dismissal of the action.

and TEX.R. DISCIPLINARY P. 15.06: [6]

> None of the following alone justifies the discontinuance or abatement of any Inquiry or Complaint being processed through the disciplinary system: (1) the unwillingness or the neglect of a Complainant to sign a Complaint or to prosecute a charge; (2) the settlement or compromise of matters between the Complainant and the Respondent; (3) restitution by the Respondent.

Appellant contends that the use of the word "alone" in these sections means that there are circumstances that justify dismissal of a complaint and such circumstances exist in this case. Appellant notes that the women settled their suits against him, they signed affidavits saying they no longer wished to pursue grievances against him, and four of the five did not assist in the prosecution of CLD's suit.

We hold that these circumstances do not require dismissal of the prosecution. The natural implication of the wording of these rules is that as long as the opposite of one or more of the mentioned circumstances exists, a court may deny a motion for directed verdict. In this case, the opposite of two of these circumstances exist: (1) a complainant did assist in the prosecution of the complaint, and (2) the respondent did not make restitution.

■ Appellant argues that to the extent O'Hare did not assign her grievance complaint to CLD and stated her desire not to pursue it, her complaint no longer existed. We disagree. TEX.R. DISCIPLINARY P. 4.06(A) [7] provides that the CLD shall:

> exercise, in lawyer disciplinary and disability proceedings only, all rights characteristically reposed in a client by the common law of this State, except where such rights are expressly hereby granted to a Committee. . . .

One such right is the right to complain about the attorney's representation. As a matter of law, under section 4.06, CLD had the right to prosecute O'Hare's complaint against appellant.

We overrule the second point of error.

**C. Constitutionality of Section 3.14 TRDP**

In his third point of error, appellant contends that the judge erred in suspending him from practice for three months under 3.14 TRDP [8] because that violated 3.08(D) TRDP,[9] which places the burden of proof in a disciplinary action on the CLD.

6. TEX.R. DISCIPLINARY P. 15.06.

7. TEX.R. DISCIPLINARY P. 4.06(A).

8. TEXAS R. DISCIPLINARY P. 3.14.

9. TEXAS R. DISCIPLINARY P. 3.08(D).

■ A strong presumption exists in favor of a statute's validity. *Vinson v. Burgess,* 773 S.W.2d 263, 266 (Tex.1989). We presume that the legislature has not acted arbitrarily or unreasonably. *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968).

Rule 3.08(D) provides: "The burden of proof in a disciplinary Action seeking Sanction ... is on the Commission. The burden of proof in reinstatement cases is upon the applicant." TEX.R. DISCIPLINARY P. 3.08(D).

Rule 3.14 provides in pertinent part:

A judgment of suspension shall be stayed during the pendency of any appeals therefrom, if the district court finds, upon competent evidence, that the Respondent's continued practice of law does not pose a continuing threat to the welfare of Respondent's clients or to the public.

TEX.R. DISCIPLINARY P. 3.14. Appellant contends the rules conflict because TEX.R. DISCIPLINARY P. 3.14 requires him to prove that his continued practice of law does not pose a continuing threat to clients or the public while TEX.R. DISCIPLINARY P. 3.08(D) puts that burden on the CLD. Appellant asserts that putting that burden of proof on him violates his procedural and substantive right to due process of law under the constitutions of the United States and Texas. We disagree.

■ Rule 3.14 creates a rebuttable presumption that appellant's continued practice of law will threaten clients or the public. This presumption is reasonable because it does not arise until after the CLD has carried its burden of proof by convincing the court to find the respondent guilty of professional misconduct. Rule 3.14 gives a respondent the opportunity to rebut that presumption.

■ Moreover, there is no conflict. Rule 3.08 puts the burden of proof on the CLD before judgment, while rule 3.14 puts it on the attorney only after an adverse judgment. A law that gives to the act of a public official the effect of raising a prima facie presumption and does not deprive the party affected of the right to rebut the presumption is not a denial of due process. *Weatherly v. Jackson,* 123 Tex. 213, 71 S.W.2d 259,

267 (Comm'n App.1934, judgm't adopted); *see also Green v. State,* 272 S.W.2d 133, 135 (Tex.Civ.App.—Beaumont 1954, writ ref'd n.r.e).

We overrule the third point of error.

**D. Sufficiency of the Evidence Regarding Continued Practice**

■ In point of error four, appellant contends that there is insufficient evidence for the court to conclude that his continued practice during a period of suspension posed a continuing threat to the welfare of his clients or to the public. Appellant cites no authority to support this point, nor does he cite pages in the record where support for his point can be found. An appellant's failure to cite to any authority constitutes a waiver of the point. *Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768, 810 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e). An appellant must refer the appellate court to those portions of the record that support his argument. *Brandon v. Am. Sterilizer Co.,* 880 S.W.2d 488, 493 (Tex.App.—Austin 1994, no writ). An appellate court is under no duty to make an independent search of the record for evidence supporting an appellant's position. *Id.*

We overrule the fourth point of error.

**E. Violation of Due Process Rights Claim**

In the fifth point of error, appellant contends that his rights to substantive and procedural due process under the constitutions of the United States and Texas were violated by the nature of the proceedings of the Grievance Committee's investigatory committee and of the trial in the district court.

Appellant relies on *Benton v. Commission of Lawyer Discipline,* 933 S.W.2d 784 (Tex. App.—Corpus Christi 1996, no writ), which is distinguishable. In that case, the court held unconstitutionally vague, Texas Disciplinary Rule of Professional Conduct 3.06(d) (1989), which prohibited a lawyer from communicating with discharged jurors to harass, embarrass, or influence their actions in future jury service. *Id.* at 788. In this point of error, appellant does not complain about any specif-

ic statute or rule being unconstitutionally vague.

We overrule this point of error. *See Pennzoil, Co.*, 729 S.W.2d at 810.

### F. Exclusion of Evidence Claim

In points of error six and seven, appellant contends the judge erred by excluding from evidence certain documents and the testimony of certain witnesses.

■ These points are not preserved for review. Texas Rule of Civil Evidence 103(a) provides:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . .

> (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer.

Appellant made no offer of proof to identify for the trial court the content of the documents or testimony he now complains were excluded. *See also Walker v. Kleiman*, 896 S.W.2d 413, 417 (Tex.App.—Houston [1st Dist.] 1995, no writ) (in the absence of a bill of exceptions [10] or an offer of proof, court has no basis to review a contention that the trial court committed reversible error by preventing defendant from introducing documents and excluding the testimony of unknown witnesses).

■ Additionally, even if appellant had preserved these points of error for review, he has not demonstrated that the exclusion of the documents and witnesses in question was reasonably calculated to cause and probably did cause the rendition of an improper judgment as required by Texas Rules of Appellate Procedure 81(b)(1).

We overrule the sixth and seventh points of error.

### G. Sufficiency of the Evidence to Support the Judgment

In his eighth and ninth points of error, appellant contends that there is "insufficient evidence" to show he violated rules 1.04(d),[11] 1.14(b), and 1.14(c) [12] of the Texas Disciplinary Rules of Professional Conduct. Appellant does not specify whether his challenge is one for legal or factual sufficiency and does not state the standard of review. He seeks reversal and rendition of the judgment. We will review the legal sufficiency of the evidence.

#### 1. Standard of Review

■ When no findings of fact are filed, the reviewing court implies all necessary findings to support the judgment. *Giangrosso v. Crosley*, 840 S.W.2d 765, 769 (Tex.App.—Houston [1st Dist.] 1992, no writ). Implied findings of fact, like the trial court's findings, may be challenged for legal and factual sufficiency. *Id.* The standard of review is the same as that applied to a jury's findings and a trial court's findings of fact. *Celanese Chem. Co. v. Burleson*, 821 S.W.2d 257, 260 (Tex.App.—Houston [1st Dist.] 1991, no writ). In reviewing a no evidence claim, we must consider only the evidence and inferences tending to support the trial court's finding, disregarding all contrary evidence and inferences. *Continental Coffee Prod. v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Id.*

#### 2. Analysis
##### a. Rule 1.04(d), Contingent Fee Agreement

Rule 1.04(d) provides in pertinent part:

> A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined. If there is to be a differentiation in the per-

---

**10.** There is a folder in the record entitled, "Bill of Exceptions," but its contents are of appellant's testimony about the investigative committee hearing and not about who would have testified and what they would have testified in the trial court had the trial court not excluded the evidence.

**11.** Tex. Disciplinary R. Prof'l Conduct 1.04(d) *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (Vernon Pamph. 1997).

**12.** Tex. Disciplinary R. Prof'l Conduct 1.14(b), 1.14(c).

centage or percentages that shall accrue in the event of settlement, trial or appeal, the percentage for each shall be stated. The agreement shall state the litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated.

■ The evidence that appellant violated rule 1.04(d) includes the following. O'Hare testified that although she asked for one, appellant never gave her a written agreement outlining his contingency fee. At the time of the mediation, appellant had not provided the clients with a written fee agreement. At the pre-mediation meeting when the clients were together in one room, appellant said if the claim settled for one million dollars, his fee would be 50 percent, a figure to which they had not agreed. When O'Hare tried to confirm what the fee agreement was, appellant dismissed the conversation, saying he would talk about it later. At the mediation, when O'Hare informed him his fee would be 33⅓ percent of the $285,000, appellant disagreed vehemently and said he should get the whole amount. Appellant admitted that exhibit 16 contains no provision for who should pay the expenses.

This amounts to more than a mere scintilla of evidence that appellant violated rule 1.04(d).

**b. Rule 1.14(b), Accounting**

Rule 1.14(b) provides in pertinent part: [the lawyer] upon request by the client or third person, shall promptly render a full accounting regarding [funds in which a client has an interest].

■ O'Hare testified that she requested an accounting of the settlement funds and expenses in August 1992, and did not receive it until 1995. The five women hired an attorney to sue appellant to get an accounting of the fees and expenses from their litigation with their former employer. This is legally sufficient evidence that appellant violated rule 1.14(b).

**c. Rule 1.14(c), Safekeeping'**

Rule 1.14(c) provides in pertinent part: When in the course of representation a lawyer is in possession of funds or other property in which both the lawyer and the other person claim interests, the property shall be kept separate by the lawyer until there is an accounting and a severance of their interest. . . . If a dispute arises concerning their respective interests, the portion in dispute shall be kept separated by the lawyer until the dispute is resolved, and the undisputed portion shall be distributed appropriately.

■ The evidence tending to support the trial court's conclusion that appellant violated Rule 1.14(c) includes the following. O'Hare testified that after the women settled their suit and appellant asked what his fee was going to be, she told him 33⅓ percent. The women's new attorney, Halbach, on September 15, 1992, sent appellant a letter demanding $23,500, the difference between the settlement funds appellant had disbursed to them and the amount they should have received under their agreement with appellant for an attorney's fee of 33⅓ percent. Appellant testified that after this time, he drew on the trust account an amount that put his attorney's fee at 35 to 36 percent of the settlement funds. Appellant testified that he had not safekept the two to three percent of his fee that was in dispute. This is legally sufficient evidence that appellant violated Rule 1.14(c).

We overrule the eighth and ninth points of error.

## APPEAL OF THE ORDER REVOKING PROBATION

Next, we review the order revoking probation of the period of suspension from the practice of law.

On May 24, 1995, the trial court signed a judgment finding that appellant had committed professional misconduct and suspended him from practice for 540 days, to begin 30 days later, with active suspension for the first 90 days and probation for the remainder. Additionally, the court ordered appellant, within 30 days of the signing of the judgment, to surrender his law license and state bar card. The court also ordered him within that same time to notify all clients, in writing, of his suspension and to return all

files, papers, monies, and other property of clients to clients or their new attorney. Further, the court ordered appellant, within the same period, to file an affidavit stating he had made the notifications and returns, enclosing with the affidavit a copy of communications to the clients. Moreover, the court ordered that if he was unable to comply with the stated time periods, he was to state under oath what clients he was unable to contact and what efforts he had made to comply with the judgment. Finally, the court ordered appellant, within the same period, to notify all judges in courts where he represented a client of the judgment and of the name, address, and telephone number of his client.

Later, the CLD moved to revoke the probation, asserting that appellant violated the judgment by: (1) failing to surrender his law license by June 23, 1995; (2) failing to submit an affidavit that he had notified all clients of his suspension, and that he had returned all files, papers, unearned fees, and other property to his clients by June 23, 1995; and (3) failing to notify the Harris County courts of his suspension. After a hearing, the judge signed an order on January 29, 1996, revoking probation. In it, the judge found appellant had violated the terms and conditions of the probation stated in the May 24, 1995 judgment.

At the hearing, Mary Klapperich testified that on July 7, 1995, she examined the district clerk's files in which appellant represented a client and determined that none of them contained a letter of notification regarding his suspension. Exhibit five is a motion to dismiss, signed by appellant and file marked August 9, 1995, in the case of *Schwartz v. Park and Fly Service Corporation.* Exhibit six is an order and judgment in that case signed by Judge Kennedy on August 11, 1995, and approved by appellant as attorney.

Exhibit nine is a letter from Klapperich to appellant stating that he had not complied with the judgment of discipline in that: (1) he had not surrendered his law license by June 23, 1995; (2) the trial court had not received the affidavit that he had notified all his current clients of his suspension and returned their files and property; and (3) he had not filed notices of suspension with the courts in which he had cases pending.

Victoria Lisinicchia testified that appellant represented her in a child custody matter. Her young niece had been placed in her custody for several years. The child's mother told her that there would be a hearing on the case. She tried to contact appellant starting about a week before the hearing, and he never called her back. She went to the July 27, 1995 hearing and had to represent herself, which was a horrible experience. Before the hearing, no one from appellant's office had notified her of his suspension. Appellant never returned her file.

Appellant testified that he intended to treat Lisinicchia the same as his other clients, which was to wait for the judge to rule, under rule 3.14 TRDP,[13] whether he could practice law pending appeal.

Faye Finney, appellant's secretary, testified that if Lisinicchia had been notified on June 23, 1995, that appellant had been suspended, there would have been no need for her to come by his office on July 26 to retrieve her file.

Appellant testified that as of June 23, 1995, he had not notified his clients in writing of his suspension or furnished the affidavit of such notifications. He sent letters notifying clients of his suspension on September 9, 1995, when the trial court had lost jurisdiction. By then, it was clear that the judge was not going to allow him to practice law pending this appeal. At that time, he also sent the affidavit to the court.

Appellant testified that he did not surrender his law license because he could not find it, but he later found it in his attic.

---

13. A district court judgment of disbarment or an order revoking probation of a suspension from the practice of law cannot be superseded or stayed. A judgment of suspension shall be stayed during the pendency of any appeals therefrom, if the district court finds, upon competent evidence that the Respondent's continued practice of law does not pose a continuing threat to the welfare of Respondent's clients or the public.... TEX. DISCIPLINARY R. PROF'L CONDUCT 3.14.

In point of error 10,[14] appellant contends that if we sustain any point of error challenging the original judgment of discipline, then we must reverse the order revoking probation because it is based on the original judgment.

We overrule this point of error because we did not sustain any such point.

In point of error 11, appellant contends there was insufficient evidence that his conduct warranted revoking probation and an 18-month suspension.

We construe this as a legal sufficiency attack. Thus, we consider only the evidence and inferences tending to support the trial court's finding, disregarding all contrary evidence and inferences. Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez*, 937 S.W.2d at 450.

■ Regarding the finding that appellant did not surrender his law license, exhibit nine and Mary Klapperich's letter of July 7, 1995, stating that the State Bar had not received the license, support a finding that appellant had violated that term. Appellant's testimony corroborated Klapperich's.

There was also more than a scintilla of evidence that appellant failed to comply with the requirement that by June 23, 1995, he notify his clients of his suspension. His client, Lisinicchia, testified that before the July 27, 1995 hearing in which she represented herself, appellant never told her of his suspension. Exhibits five and six, pleadings to dismiss the suit of the Swartzs' against Park and Fly, are evidence that appellant did not notify them of his suspension by June 23, 1995. Appellant admitted he did not comply with this term of the judgment by the required date.

Concerning the requirement that by June 23, 1995, appellant notify the courts in which he had cases pending of his suspension, Klapperich testified that on July 7, 1995, she examined the relevant files and saw no notices to the judges of appellant's suspension.

Appellant testified that he waited until September 9, 1995, to mail such notices.

We hold there was sufficient evidence that appellant violated these terms of the judgment. We overrule point of error 11.

In points of error 12 and 13, appellant contends that several federal and state constitutional rights were violated by the order revoking probation and by the procedure that led to it.

■ Appellant has not preserved some of these complaints, i.e., excessive punishment and equal rights guarantees, for review because they are untimely, being made for the first time here on appeal. *See Minnick v. State Bar of Texas*, 790 S.W.2d 87, 89 (Tex. App.—Austin 1990, writ denied); *Pennzoil*, 729 S.W.2d at 856–58.

■ Regarding appellant's due process claims, a party is entitled to a reasonable opportunity to have such issues heard and determined by the court. *Pennzoil*, 729 S.W.2d at 857. Appellant was served with the CLD's motion to revoke his probation no later than August 21, 1995. He filed his answer on December 1, 1995. It raised no constitutional issues. The trial on revocation was held on December 6, 1995. No constitutional issues were adjudicated then.

■ Appellant contends that he unsuccessfully tried to raise constitutional issues at the revocation hearing. The record, in the location he cites, shows that he was not then requesting relief on constitutional grounds, but rather was answering opposing counsel's question concerning his belief about the State Bar's motive for moving to revoke his probation.

In his motion for new trial, appellant asserted that "one or more provisions of the revocation order are in violation of the due process guarantees, both procedural and substantive, of both the United States and Texas Constitutions." Rule 52(a), Texas Rules of Appellate Procedure, requires a party to state "the specific grounds for the ruling he desires if the specific grounds were not ap-

---

**14.** Appellant's points of error are continuations of his points of error from his first brief attacking the original judgment.

parent from the context." TEX.R.APP. P. 52(a). Appellant has not identified the specific portions of the trial or of the order that violated his due process rights, nor how they did so. Thus, nothing is presented for review.

We overrule points of error 12 and 13.

We affirm the judgment.