

## NUMBER 13-09-00579-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

### IN THE ESTATE OF MYRTLE MARIE BROOKS, DECEASED

**On appeal from the County Court at Law No. 2
of Nueces County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Justice Benavides**

This is a will contest case. By seven issues, pro se appellant, Melta Brooks-Cannon, contends the trial court erred when it: (1) failed to recognize the last will and testament of her grandmother, Myrtle Marie Brooks; (2) allowed jurors to hear testimony about Myrtle's physical and mental capacity from a non-expert witness; (3) allowed Melta's medical history and certain character evidence to be admitted into

evidence; (4) failed to provide clear instructions to the jurors regarding the jury charge; (5) appointed a guardian ad litem; (6) allowed testimony regarding alleged undue influence; and (7) did not accept certain medical records regarding Myrtle's health and well-being into evidence. We modify the trial court's judgment and affirm as modified.

## I. BACKGROUND

Myrtle died at the age of ninety-three in Corpus Christi, Texas. Myrtle was survived by two sons: Henry Clayton Brooks and Winston Gene Brooks. After their mother's death, Henry and Winston jointly filed an application to be dependent co-administrators and for issuance of letters of dependent administration. In the application, Henry and Winston represented that they were Myrtle's only living children; their brothers Connie O'Neal Brooks and Bobby Joe Brooks had pre-deceased their mother. Henry and Winston's motion also declared that Myrtle died without leaving a valid will and "owned real and personal property . . . cash, bank accounts, an automobile, household furniture, and other personal effects of a probable value in excess of $50,000." They sought to be joint co-administrators of her estate because there were at least two debts against the estate, including expenses for Myrtle's final illness. Henry and Winston were appointed co-administrators on October 24, 2006.

On January 11, 2007, Melta filed a motion for new trial. Melta is Myrtle's grand-daughter; her father was the late Connie, brother of Henry and Winston. In her motion, Melta contended that Myrtle had executed a valid will that named Melta the sole independent administrator of Myrtle's estate. Melta requested that the court set aside

2

the order deeming Henry and Winston co-dependent administrators. In response to Melta's motion, Henry and Winston filed a second application to be appointed dependent co-administrators. In this second application, Henry and Winston re-urged that their mother died intestate and argued that Melta possessed an invalid will. In the alternative, they argued that if Melta in fact possessed a valid will that it was procured through undue influence.

The trial court denied Melta's motion for new trial. However, pursuant to section 83(a) of the Texas Probate Code, the court held a jury trial to consider the will Melta possessed, along with Henry and Winston's application, to determine whether Myrtle indeed died intestate. *See* TEX. PROB. CODE ANN. § 83(a) (West 2010).[1] During the trial, Henry testified that Myrtle suffered a slip-and-fall in February 2004 which partially paralyzed the left side of her body. Upon her doctor's recommendation, the family admitted Myrtle to The Palms Center in Corpus Christi for rehabilitation and daily assisted life care after her fall. Myrtle was upset about this recommendation and wanted to simply return home. However, she was ultimately admitted for health reasons.

---

[1] The statute provides as follows:

> If, after an application for the probate of a will or for the appointment of a general personal representative has been filed, and before such application has been heard, an application for the probate of a will of the decedent, not theretofore presented for probate, is filed, *the court shall hear both applications together* and determine what instrument, if any, should be admitted to probate, or whether the decedent died intestate.

TEX. PROB. CODE ANN. § 83(a) (West 2010) (emphasis added).

3

Henry stated that he and his wife Ninfa visited his mother at The Palms daily, because they lived in Corpus Christi. His brother Winston lived in Harker Heights, Texas, which was about five hours away, so Winston could not visit as often. Henry soon began to worry about his mother's mental health when she mentioned seeing relatives who had already died and could not remember if she had eaten on a particular day. He stated that they never discussed a will because Myrtle said her boys would "do what's right" and that her "boys always [did] the right thing." She treated all of her sons equally. Henry's wife, and Melta's aunt, Ninfa Salazar, corroborated this testimony. She testified that Myrtle told her that she did not need a will because "everything was for her boys."

Henry testified that he learned his mother had executed a will approximately eight months before her death. He received a phone call from Winston informing him about the alleged will. He was "in awe and shock" about the will's existence and believed that the will was his niece Melta's idea. He stated that his niece Melta acted "strange" toward him when she first arrived from California to visit his ailing mother at The Palms. Shortly after that encounter, he found Melta at his mother's house reviewing Myrtle's car ownership papers and insurance policies. He soon became concerned about the purpose of Melta's visit when he called The Palms for an update on his mother's health and they refused to release information to him due to HIPAA laws.[2] Apparently, Melta

---

[2] HIPAA stands for the Health Insurance Portability and Accountability Act of 1996. Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended at 42 U.S.C.A. §§ 1320d-1320d-8 (2007)). The law provides, among other things, federal protections for personal health information held by covered entities

4

had had Myrtle sign a power of attorney which allowed only Melta and another cousin access to Myrtle's medical records and denied access to anyone else. Henry testified that Melta moved into his mother's home while Myrtle was recovering at The Palms and that he paid for repairs to the refrigerator and water heater at his mother's house during this time. He also loaned Melta his vehicle and gave her money for food. After Myrtle's death, Henry explained that someone from American Bank called him. The bank representative stated that Melta was at the bank trying to liquidate Myrtle's account with a power of attorney document.

Winston testified next. He stated that he was very close to his mother and that, although he lived further away, he spoke to her on a daily basis and would spend long weekends with her. He testified that she treated all of her children equally and did not favor anyone in particular. Winston testified that his mother was progressing nicely at The Palms until Melta visited from California. At that point, he stated that "it just snowballed downhill." He stated that Palms nurses complained that Melta was interfering with their care of Myrtle—she complained about what they were feeding Myrtle and left constant harassing notes on a blackboard in Myrtle's room. He testified that Melta was "hostile" toward him and the nursing staff—she "scream[ed], hollered[ed]" and was "belligerent." He was very upset when Melta obtained the power of attorney, which prevented him from receiving information about his mother's medical care.

and gives patients an array of rights with respect to that information.

Winston testified that he confronted Melta about her behavior at The Palms and said that she needed to stop being a "paranoid schizophrenic" regarding Myrtle's care. He was surprised when Melta responded, "how did you find out about my medical record?" Winston also discussed how he learned about Myrtle's will at trial:

> WINSTON: She [Melta] calls me up and she's going—she's all—I don't know if her meds were off or what. But she's like, I'm leaving here, goddamn it, and you're going to take care of your own mother. I'm like, what? Hold on. Hold on. What are you talking about? [She said] I'm leaving and I'm going to go get this will changed back and I'm going to put it back in you and Henry's name. I said, wait a minute, what will? Well, I have a will and I'm going to—and then she hung up.

Winston stated that he was surprised because his mother never discussed a will with him or his brother. He felt "if she would have wanted to write a will, Henry and I would have been notified by [his] mom in some kind of way." At one point, Winston also stated that he received a call from his mother that concerned him:

> WINSTON: She [Myrtle] calls up. It was a strange call because she was on the other end of the line. She said, Poochie, Melta is trying to kill me. I'm like, what? She's messing with my medications. I said, oh, mom. I'll check into it.

Winston also testified that he was disturbed one day when he arrived at his mother's home after she had been released from the Palms. His mother was home alone with Melta. He testified that his mother had seven to eight duragesic medicine patches all over her body, and he accused Melta of placing them on her body. Winston also testified that, over the years, Melta frequently called him for money. She would say

6

she was hungry, so he would wire her money via Western Union.

Minerva Brooks, the late Connie's wife and Melta's stepmother, testified. She stated that Melta primarily grew up with her mother in California. Melta later moved to Texas briefly when her father became ill with cancer. Minerva recalled that during this time, Melta discussed being treated by a psychiatrist and would have "split personalities" at times. She left four days before her father died but later called to see if her father left a will and if she was in the will. Minerva also claimed that Melta stole items from her household, always needed money, and was concerned about Social Security benefits. A neighbor, Dorothy Frances, testified that she saw Melta moving furniture and boxes out of Myrtle's house while Myrtle was still being treated at The Palms.

Sandra Larson, a licensed social worker who worked at The Palms in 2004, testified about Myrtle's medical condition upon admission. Reviewing Myrtle's admission sheet, Larsen reported that Myrtle suffered from a previous cardiovascular accident or stroke, was paralyzed on the left side of her body, had hypertension, osteoarthrosis, reflux sympathetic dystrophy, pleural refusion, and was constipated due to her pain medications. Larsen testified that she noticed some "strong signs and symptoms of depression" approximately one month after Myrtle was admitted to the Palms. Myrtle was also in constant pain because of her arthritis. Larson described Melta as "one of the most difficult people that I have ever dealt with." She stated that several certified nurse assistants requested to be reassigned from caring for Myrtle because they did not want to suffer Melta's "abuse."

7

Melta testified that she grew up in California for most of her life, but lived with her father and Myrtle in Corpus Christi at one point during high school. At the time of Myrtle's death, she lived in California with her husband and children. Melta left her family when Myrtle allegedly called her to come and care for her at The Palms. Melta explained that the reason she was so direct and forthright with the caregivers at The Palms was because they were giving sub-par care to Myrtle. She alleged that they fed Myrtle food to which she was allergic, failed to take her to the toilet when requested, and did not regularly move her which led to bed sores. Melta explained that she did not attend Myrtle's funeral because no one in her family told her when or where it was to be held. Upon cross-examination, though, she admitted that she left for California the same day Myrtle died. She also admitted that she left a copy of Myrtle's will at a lawyer's office before she left on the plane to California.

Myrtle's will named Melta the sole independent executor of her estate. Melta was also the primary beneficiary of the will: Myrtle bequeathed Melta her furnished home and vehicle, valued at approximately $50,000. Myrtle's only living sons received less—Henry was left a table, chair, and lamp, while Winston was left a china cabinet. Other relatives also received certain household items.

The jury found that Myrtle lacked the testamentary capacity to execute a will and that the will was procured through undue influence. Melta then filed this appeal.

II. ANALYSIS

## A.    The Last Will and Testament of Myrtle

By her first issue, Melta argues that the trial court erred when it "failed to recognize the last will and testament of Myrtle Marie Brooks."  We construe this issue as a challenge to the legal and factual sufficiency of the jury's findings that Myrtle lacked the testamentary capacity to execute a will and that her will was procured through undue influence.

### 1.   Standard of Review and Applicable Law

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact.   *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).   In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact finder could and disregard evidence contrary to the finding unless a reasonable fact finder could not.   *See City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

In reviewing an appellant's factual sufficiency challenge to an adverse jury finding on which the other party had the burden of proof, we will consider all of the evidence in the record, both in support of and contrary to the finding.   *See Dow Chem. Co. v.*

9

*Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We will set aside the district court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Where there are disputed issues of fact, we give deference to the fact-finder as they are the "sole judges of credibility of the witnesses and the weight to be given to their testimony." *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex. 1993).

### 2. Analysis

The evidence shows that Myrtle was ninety-three years old at the time of her death. She was recovering from a fall that had left her partially paralyzed, and had several underlying illnesses such as hypertension, osteoarthrosis, and reflux sympathetic dystrophy to complicate the recovery from her fall. According to various witnesses, Myrtle was depressed about being admitted to a nursing home to recuperate. Henry testified that he worried about his mother's state of mind when she could not recall whether she had eaten on a particular day and reported seeing dead relatives. In light of the foregoing evidence, we hold that a reasonable fact finder could find that Myrtle lacked the testamentary capacity to execute a will. Myrtle's physical and mental well-being were fragile due to her health problems and medications. The evidence was legally sufficient to support the jury's finding that Myrtle lacked testamentary capacity. *City of Keller*, 168 S.W.3d at 827. This finding is also factually sufficient, because it is not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *Cain*, 709 S.W.2d at 176.

10

Further, the evidence shows that Myrtle's two sons, Henry and Winston, were close to her. They and their wives visited Myrtle at The Palms as often as they could while she was recuperating. Myrtle had never discussed creating a will because, according to Henry and Winston, Myrtle knew that her boys would "do what's right." Winston said that Myrtle treated all of her children equally and did not favor any of them. The testimony regarding Melta indicated that she had financial troubles and frequently asked for money from her uncles. The evidence also showed that Melta had her grandmother sign a power of attorney and that Myrtle's will left the bulk of the estate to Melta. There was also testimony that Melta tried to liquidate her grandmother's bank account after her death and that Melta had allegedly stolen items from her stepmother's and grandmother's homes.

We hold that a reasonable fact finder could deduce that Melta unduly influenced her grandmother Myrtle to create a will to devise a disproportionate amount of her estate to Melta. The evidence showed that Melta isolated Myrtle from her sons and their wives through a power of attorney document. Melta's finances, based on the record, appeared to be strained, and she received the bulk of Myrtle's estate in the will, whereas Henry received a table, chair, and lamp and Winston received a china cabinet. We conclude that the evidence was legally sufficient to support the jury's finding on undue influence. *City of Keller*, 168 S.W.3d at 827. We also conclude that, after considering all of the evidence in the record, the finding of undue influence is not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust."

11

*Cain*, 709 S.W.2d at 176.   Accordingly, the jury's finding of undue influence was also factually sufficient.   We overrule Melta's first issue.

**B.      Evidentiary Issues**

By issues two, three, six, and seven, Melta challenges the trial court's decision regarding certain evidentiary issues.   The admission or exclusion of evidence is a matter within the trial court's discretion.   *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (citing *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex. 2001)).   To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error was calculated to cause and probably did cause the rendition of an improper judgment. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).   "Erroneous admission of evidence requires reversal only if the error probably (though not necessarily) resulted in [the rendition of] an improper judgment."   *Id.*; *see also* TEX. R. APP. P. 61.1(a).   We address each of Melta's evidentiary issues in turn.

**1.   Evidence on Myrtle's Physical and Mental Capacity**

In issue two, Melta argues that the trial court inappropriately allowed jurors to hear testimony about Myrtle's physical and mental capacity from a non-expert witness, Sandra Larson.   Melta specifically complains Larson "is not a [sic] RN, and is not able to make a diagnosis" regarding whether Myrtle may have lacked the mental capacity to execute a will.

Pro se litigants must abide by the same standards as licensed attorneys and

12

comply with applicable laws and rules of procedure. *See Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184-85 (Tex. 1978); *Giddens v. Brooks*, 92 S.W.3d 878, 880-81 (Tex. App.—Beaumont 2002, pet. denied). "There cannot be two sets of procedural rules, one for litigants with counsel and the other for litigants representing themselves." *Mansfield,* 573 S.W.2d at 185 (citing *Stein v. Lewisville Ind. Sch. Dist.*, 481 S.W.2d 436 (Tex. Civ. App.—Fort Worth 1972, writ ref'd n. r. e.)). Here, Melta failed to object when Larson testified at length about Myrtle's physical and mental capacity. *See* TEX. R. APP. P. 38.1 ("As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion . . . ."). Accordingly, Melta failed to preserve error on this point, and we overrule this issue. *Id.*

### 2. Melta's Medical History and Character Evidence

In issue three, Melta argues that the trial court erred when it allowed Melta's personal medical history and certain character evidence to be admitted into evidence. Again, though, Melta failed to timely object when testimony regarding her character was admitted. *Id.* For example, while at a bench conference during the testimony of witness Larson, the following exchange occurred:

[MELTA]: While we're here, can I just ask a question? This evidence, the continuing of evidence regarding my character, that's just all going one way and is this—

[THE COURT]: You're going to have a chance to ask her questions and you will also have an opportunity to testify as well.

13

| | |
|---|---|
| [MELTA]: | Okay. But my question is, is this relevant to the case with regards to her being incapacitated or undue influence? |
| [THE COURT]: | Well, it's already in. So that was something that should have been brought up before I admitted it. |

Although Melta later timely objected to the admission of certain testimony about her character evidence, the evidence had already been admitted. To preserve error, appellant could have requested a running objection or objected to all the testimony deemed objectionable. *See Schwartz v. Forest Pharmaceuticals, Inc.*, 127 S.W.3d 118, 124-25 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). "Error in admitting evidence is cured where the same evidence comes in elsewhere without objection." *Id.* at 124 (holding that error was waived when the appellant failed to timely object to repeated references about his alleged litigious nature). Because Melta failed to timely object to preserve this issue, we overrule issue three.

### 3. Testimony Regarding Undue Influence

In issue six, Melta contends that the trial court erred when it admitted testimony regarding alleged undue influence over the creation and execution of Myrtle's will. We overrule this issue on the same basis that we overruled issues two and three. Melta failed to timely object and thus preserve error when testimony regarding her alleged undue influence was admitted into evidence. *See* TEX. R. APP. P. 33.1.

### 4. Exclusion of Records

In her seventh issue, Melta complains that the trial court did not accept certain

14

documents regarding Myrtle's health and well-being into evidence. Based on our review of the record, we presume that Melta is referring to the medical records from Jordan Health Services. The record indicates that Melta called the custodian of records from Jordan Health Services, Patricia Nunez, onto the stand during trial. Henry and Winston's counsel objected to these documents because they were not self-authenticated. Melta could not establish the proper predicate to authenticate the documents and, thus, could not offer them into evidence. On the record, Melta stated, "I just—Your Honor, at this point I think I'll just dismiss the witness because I don't know what . . . the predicate is."

To complain on appeal that the trial court improperly excluded evidence, the party must have first preserved error by offering the evidence and securing an adverse ruling from the trial court. *See Perez v. Lopez,* 74 S.W.3d 60, 66 (Tex. App.—El Paso 2002, no pet.); *see also Dean-Groff v. Groff*, No. 13-06-085-CV, 2007 Tex. App. LEXIS 8881, at *14 (Tex. App.—Corpus Christi Nov. 8, 2007, no pet.) (mem. op.). The complaining party must have complied with Texas Rule of Evidence 103(a)(2) which states that error may not be predicated upon a ruling that excludes evidence unless, "the substance of the evidence was made known to the court by offer, or was apparent from the context within which questions were asked." TEX. R. EVID. 103(a)(2); *see* TEX. R. APP. P. 33.1(a)(1); *Wade v. Comm'n for Lawyer Discipline,* 961 S.W.2d 366, 374 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Without an offer of proof, this Court cannot determine whether exclusion of the evidence was harmful. *Perez,* 74 S.W.3d at 66-67.

15

Melta made no offer of proof. Further, she did not offer the excluded evidence into the record by filing a formal bill of exception within thirty days of filing the notice of appeal. *See* TEX. R. APP. P. 33.2. Because we cannot consider the records and because the substance of the records is not apparent from the record, Melta has failed to preserve error regarding these reports. *See Wade,* 961 S.W.2d at 374 (holding that, in the absence of offer of proof, an appellate court has no basis to review a contention that the trial court committed reversible error by preventing defendant from introducing documents). Accordingly, we overrule this issue.

**C.    Issues Regarding the Jury Charge and Closing Arguments**

By her fourth issue, Melta complains that the jury charge "was not relevant or consistent to the issues presented in opposition to a will contest." However, during the charge conference, the trial court specifically asked Melta: "Do you have any objections [to the charge]?", and Melta replied, "No. That's fine." Accordingly, we hold that Melta failed to preserve error on this issue. *See* TEX. R. APP. P. 33.1.

Melta also argues that counsel for Henry and Winston "continued to give incorrect and confusing interpretations of the law, and to the jurors regarding 'yes or no' answers, and the Jurors were still confused when they rendered their decision." We presume that Melta refers to opposing counsel's closing arguments, where counsel offered guidance on how to answer the jury charge. Melta did not object during counsel's closing arguments, so this sub-issue has also been waived. *Id.*

16

Melta finally contends that "the prepared Final Judgment was not consistent with the juror's verdict." The jury charge posed two questions to the jurors in this case. Question 1 asked the jury the following: "Do you find from a preponderance of the evidence that Myrtle Marie Brooks lacked the testamentary capacity to make and sign her Last Will and Testament?" The jurors answered "Yes" to this question. Question 2 asked, "Do you find from a preponderance of the evidence that the Last Will and Testament of Myrtle Marie Brooks, dated May 14, 2004, was made as the result of undue influence exercised by Melta Brooks-Cannon over Myrtle Marie Brooks?" The jurors answered in the affirmative to this question, as well. However, the Final Judgment states that "the jury . . . answered 'No' to Question 1, and 'Yes' to Question 2 . . . ."

This error did not cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1. The jury found two bases upon which to invalidate the will, but the judgment, because of a clerical error, only refers to one. Pursuant to Texas Rule of Appellate Procedure 43.2(b), the remedy for this challenged inconsistency is not to reverse the judgment, as Melta urges, but to modify the trial court's judgment to reflect that the "jury answered 'Yes' to Question 1, and 'Yes' to Question 2." *See* TEX. R. APP. P. 43.2. Having addressed all of the sub-issues in issue four, we overrule it.

## D.     The Appointment of an Attorney Ad Litem

Melta's fifth issue complains that the court appointed attorney Joe A. Flores as an attorney ad litem on October 16, 2007, when Henry and Winston filed their application for determination of heirship. In her brief, Melta argues that Flores's "duties were to

17

represent [Myrtle's] heirs." She complains that Flores instead "reported to the court regarding [Melta's] medical background, and referred to information again that was obtained illegally . . . i.e. 10-year-old bankruptcy issues and psychiatric medical background wit to [sic] Bi-polar."

Melta's appellate point of error is unclear in this regard. *See* TEX. R. APP. P. 38.1(i). It appears that Melta disagrees with Flores's testimony and report in the case. We note that the only time Flores appears in the record is outside the presence of the jury when he discussed his appointment with reference to the application for determination of heirship and his compensation for work done in that regard. Melta also references a report that Flores submitted to the trial court as part of that appointment, but Flores's report is not in the appellate record. Because neither Flores's testimony nor his report were preserved for this Court to review, we overrule Melta's fifth issue. *See* TEX. R. APP. P. 33.1.

## III. CONCLUSION

Having overruled all of Melta's issues on appeal, we modify the clerical error in the judgment and affirm the judgment of the trial court, as modified.

 

 

_____
GINA M. BENAVIDES,
Justice

Delivered and filed the
23rd day of June, 2011.

18