# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00428-CV

**Sharon G. Wright, Appellant**

**v.**

**Elis Lessard, Winfred Baggett, and Carolyn Baggett, Appellees**

## FROM THE DISTRICT COURT OF COMAL COUNTY, 274TH JUDICIAL DISTRICT NO. C99-366C, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Sharon G. Wright appeals from the judgment in this suit arising from land sales. Seller Wright and buyers Winfred Baggett and Carolyn Baggett had an oral agreement that the Baggetts would give Wright the chance to repurchase the land before they sold it to anyone else. All three mistakenly believed that Wright's home was located on property adjacent to the lot sold. This suit concerns the effect and performance of the right of first refusal and the effect of the mutual mistake on a subsequent buyer, Elis Lessard, who bought the land knowing of the mistake. This appeal concerns those issues, as well as the power of the district court to fashion an equitable remedy that requires Wright to give real estate indirectly involved in these transactions in order to recover the land actually sold. We affirm the judgment.

## BACKGROUND

Wright owned adjacent parcels of land—Lots 104 and 105—in Bulverde West, Comal County. Lot 104 includes 2.01 acres and, at trial, was valued by the county tax appraiser at $9,950 with no value assigned to improvements. Lot 105 includes 1.83 acres and, at trial, was valued by the county tax appraiser at $38,260: $9,060 for the land and $29,200 for the improvements. Relying at least in part on the tax appraiser's valuations, Wright believed that her two-story, 1700 square-foot house was on Lot 105, along with a barn and a well that serves the house; Winfred Baggett testified that Wright told him that the house was close to or slightly over the property line with Lot 104. Wright experienced financial difficulties that endangered her ownership of these lots; she was behind on mortgage and tax payments. She was expecting to receive social security benefits, but was uncertain that the benefits would arrive soon enough to allow her to stave off foreclosure.

Wright was contemplating getting a high-interest loan to help keep the property when her friends, the Baggetts, persuaded her instead essentially to sell some land to them as a sort of loan. They would buy Lot 104 and hold it until she could repurchase it or they needed to sell it. The Baggetts orally agreed that, before selling the land to anyone else, they would offer to resell the land to Wright for the amount they paid her. There is no writing memorializing any part of this agreement, including this right of first refusal. In May 1997, the Baggetts paid approximately $6,100 to Wright's mortgage company, and she granted them a general warranty deed to Lot 104; the mortgage company canceled the foreclosure. The Baggetts later paid $1,200 in back taxes owed to Comal County on Lot 104.

The Baggetts then bought a house of their own and decided to sell Lot 104. In April 1998, they had the land surveyed. They expressed surprise after learning that Wright's house was entirely on Lot 104. The Baggetts petitioned the local government to replat the lots so that Lot 105 would remain the same size but include Wright's house. Winfred Baggett testified that Comal County refused to replat the land while back taxes remained owing on Lot 105. He testified that Wright denied owing taxes. He also said that the Baggetts offered to sell Lot 104 back to Wright, but she declined because she did not have enough money. They then sold the property to Lessard for $7,800.

When buying the property, Lessard knew of the mistake about the location of Wright's house. Lessard originally received a quitclaim deed on November 12, 1998. Five days later, Lessard wrote Wright a letter offering various ways to resolve the dispute with Wright. On December 1, 1998, Wright's attorney wrote the Baggetts a letter requesting that they not sell the property because she would soon be able to repay them when she received her social security payment; Wright offered to pay the purchase price, the back taxes, and the surveying fees that the Baggetts had paid. On December 7, 1998, Lessard received a special warranty deed from the Baggetts.

Lessard testified that she tried to work out an agreement that would allow Wright to remain on the property. She offered to buy Lot 105 for $10,000 or to pay $5,000 for the house, even though she did not feel obligated to pay for the house. Lessard said she considered reforming the plat of the land so that the lots would be the same size as before, but Lot 105 would include the house. She alternatively considered selling a part of the land to Wright or offering her a life estate.

3

Lessard testified that she paid $846.86 in taxes and made infrastructure investments on Lot 104. She had a water well drilled, had test holes drilled for a septic system, and paid for the installation of an electric pole. Lessard testified that Wright prevented the electric company from installing the pole, called the police when the septic holes were being drilled, and told Lessard to get off the land. Lessard testified that she also paid $2,250 in legal fees.

Wright's attorney wrote Lessard and the Baggetts a letter in February 1999 informing them that Wright had the money to repurchase Lot 104 and that Wright would not reimburse anyone for improvements undertaken after the discovery that the house actually rested on Lot 104.

Wright rejected proposed reformations of the lot lines in part because they did not account for the roads across Lot 104 that she used to access her house and barn. She believed that the topography of Lot 105 made putting roads across it impracticable.

## PROCEDURAL HISTORY

Lessard filed this suit, seeking judgment for title to and possession of Lot 104. She also sought $1,000 per month in rent from Wright for her use of Lot 104. By a subsequent amended petition, Lessard requested reformation of the property boundaries so that Lot 105 would include the house; the proposed reformation moved an equal amount of land (that included the barn) from Lot 105 into Lot 104, and required Wright to remove the barn from the redesignated property and build driveways on Lot 105.

Wright denied Lessard's allegations, and filed a third-party action against the Baggetts. She noted that all parties were aware of the confusion about the location of the house, and asserted that the Baggetts violated the agreement that she would have the right of first refusal before

4

they sold the property. She eventually sought to have the transfers to the Baggetts and then to Lessard declared void and to have Lot 104 reconveyed to her, with the purchasers being refunded their respective purchase prices. She alternatively sought declaration of easements across Lot 104 for her driveways and a recovery for the unjust enrichment conferred upon the buyers who purchased Lot 104 without paying for the house. No party at trial pleaded the statute of frauds against oral conveyances of real estate. *See* Tex. Bus. & Com. Code Ann. § 26.01 (West 2002).

After a nonjury trial, the court appointed a special master, who provided two options for disposition of the property: either the court should redraw the boundary or the parties should exchange lots. After Wright rejected both of the master's options, the court permitted Lessard to choose between the options. She chose the latter.

The court rendered judgment in accord with Lessard's choice. The court ordered Lessard and Wright to exchange ownership of Lots 104 and 105; thus, Wright would own Lot 104 with the house and Lessard would own Lot 105. Wright had ninety days from the date of judgment to remove the barn and the pump from the water well on Lot 105; if either remained on Lot 105 after that, they would become Lessard's property. The court imposed an equitable lien on Wright's property after she failed to pay her $750 share of the master's fee, and requested that the taxing authorities transfer their liens from Lot 105 to Lot 104. The court dismissed all causes of action against the Baggetts with prejudice.

On appeal, Wright asserts in her brief that she is now able to do equity and pay for reconveyance of the property in accordance with her agreement with the Baggetts.

5

**DISCUSSION**

Wright appeals, contending that the court did not have the power to order Wright to surrender Lot 105 because that property was not the subject of the sale or this suit. She contends that the proper remedy is rescission of the sales. She contends that the original sale to the Baggetts should be rescinded due to the mutual mistake about the location of the house. She also contends that Lessard took subject to her right of first refusal, and that Lessard failed to prove that the right was honored.

**Right of First Refusal**

Wright argues that the evidence failed as a matter of law to prove that the Baggetts complied with the right of first refusal because no evidence supports some necessary elements. When reviewing the legal sufficiency of the evidence to support a judgment by a court after a nonjury trial in which no findings of fact or conclusions of law were filed, we apply the same standard we apply in a jury trial. *See Wade v. Commission for Lawyer Discipline*, 961 S.W.2d 366, 374 (Tex. App.—Houston [1st Dist.] 1997, no writ). We must imply all necessary findings and view the evidence in a light that tends to support the implied findings and disregard all evidence and inferences to the contrary. *Id.*; *see also Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002).

Some facts are undisputed. The Baggetts admit that they agreed that, before they sold the property to anyone else, they would offer Wright the opportunity to repurchase the property for the same amount they paid for it; Winfred Baggett testified that the parties never used the term of art "right of first refusal." Wright admits that the Baggetts told her they wanted to sell the property

6

and that Lessard was interested in buying it, and that Wright told the Baggetts she did not have the money at that time.

Wright complains that there was no evidence of the following: (1) that Lessard had made an offer when they asked Wright if she could make the purchase; (2) that the Baggetts offered Wright the same terms as Lessard; (3) that Wright had a reasonable time in which to buy the property before Lessard bought it; and (4) that Wright received notice of the sale to Lessard and an opportunity to buy the property in November.

The Baggetts, however, were not required to offer Wright the same terms as Lessard. Generally, a would-be seller bound by a right of first refusal must offer the right-holder the chance to purchase on the same terms as a bona fide purchaser. *See Sanchez v. Dickinson*, 551 S.W.2d 481, 484-85 (Tex. Civ. App.—San Antonio 1977, no writ). But the agreement in this case undisputedly required the Baggetts to offer Wright the chance to buy the property at the price the Baggetts paid; they did not use the phrase "right of first refusal" at the time of the agreement, and their agreement did not refer to the price the Baggetts might get from another buyer. The undisputed evidence is that they offered Wright the chance to buy and that she could not purchase the land due to lack of funds. Even after the property sold in November 1998, her attorney's December 1, 1998 letter shows she still lacked sufficient funds to repurchase the property pending the award of social security benefits.

Wright had a reasonable amount of time to buy the property. The agreement did not specify a time frame within which Wright must buy the property. When a contract does not provide a time for performance, the law will imply that performance must occur within a reasonable time. *Pearcy v. Environmental Conservancy of Austin & Cent. Tex., Inc.*, 814 S.W.2d 243, 246 (Tex. App.—Austin 1991, writ denied). Factors affecting reasonableness include the purpose of the

7

agreement, the nature and character of the action, and the difficulty of accomplishing it. *Id*. The

Baggetts discovered in April 1998 that the house was on the lot they owned. Caroline Baggett sent

a card on May 5, 1998 to Wright discussing the survey results and indicating the need to resolve the

boundary problem for everyone—including Lessard; the card was sent five months before the

Baggetts sold the property to Lessard. Winfred Baggett testified that, after he notified Wright of

their intent to sell the property, he went through municipal and county authorities to try to get the lots

replatted.[1] Although Wright's affidavit attached to her motion for new trial was not before the trial

court when it rendered judgment, it confirms the evidence at trial. Wright averred that the Baggetts

first demanded repayment in late May or early June 1998, introduced her to Lessard in June 1998,

threatened to sell the lot to Lessard in July 1998, and sold the property in November 1998. Wright

complains that she did not get the two weeks' notice she testified that the Baggetts agreed to give

her. But the evidence shows that she knew for five months that the Baggetts wanted to sell the

property to Lessard. Wright had a reasonable time in which to exercise her right to purchase the

property.[2]

**Mutual mistake**

Wright contends that the mutual mistake regarding the location of her house made

in the original sale should have resulted in rescission of the transfers of the land to the Baggetts and

---

[1] Although we cannot base our decision on documents not in the appellate record, documents attached to Wright's brief indicate that the replatting requests occurred in June 1998.

[2] Even if this evidence had been introduced at trial, the district court could have disregarded it because the Baggetts did not testify that they agreed to such a restriction. The court also could have considered the introduction of Lessard and "threats" to sell it to her as notice; Wright undisputedly knew Lessard wanted to buy the property more than two weeks before November 1998.

Lessard. Wright and the Baggetts undisputedly mistook where the house was located, and Lessard bought Lot 104 knowing of that mistake and expressly subject to Wright's claim.

An agreement may be avoided if the parties contracted under a misconception or mistake of a material fact. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). Where a mutual mistake exists, the parties acting under the same misunderstanding of the same material fact are entitled to rescind their contract and be restored to positions held before entering the contract. *Id.*; *see also Leonard v. Eskew*, 731 S.W.2d 124, 131 (Tex. App.—Austin 1987, writ ref'd n.r.e.) (describing remedy of rescission). If it can be established that a contract sets out a bargain that was never made, it will be invalidated. *Williams*, 789 S.W.2d at 265.

But rescission is available only if the party seeking rescission returns, or offers to return, any consideration he has received. *Johnson v. Cherry*, 726 S.W.2d 4, 8 (Tex. 1987). When rescission is granted, the original status of the parties must generally be restored. *See id.*; *see also Texas Co. v. State*, 281 S.W.2d 83, 91 (Tex. 1955) ("He who seeks equity must do equity."). Rescission of the contract and a restoration of each party to the position he occupied before the contract was made is the proper relief, unless it is alleged and proved that some other would be more just and equitable. *Landrum v. Thomas*, 149 S.W. 813, 815 (Tex. Civ. App.—Austin 1912, no writ).

Wright's claim for rescission fails because of her consistent inability to refund the buyers' money. Before the Baggetts sold the land, Wright told them she was unable to pay for the land. The December 1998 letter from her attorney shows she lacked the funds even after the Baggetts sold the lot to Lessard. Her affidavit of indigence after the judgment showed she lacked

9

the funds at trial, which was after she received the social-security settlement.[3]  Because Wright was unable to refund the purchase price, rescinding the transfers would have been inequitable to the buyers.  The court did not err by refusing to rescind the transfers.

**Equity**

Wright complains that the judgment is inequitable because it deprives her of property (Lot 105) that was not part of the sale.  She agrees that leaving Lessard in possession of Lot 104 would have been inequitable because Lessard would own the house without paying for it and thus be unjustly enriched.  Wright demands that she either be given ownership of both lots (for which she now asserts that she is able to pay) or that Lessard or the Baggetts be forced to pay for the house they did not intend to buy.  Wright alternatively requests replatting of the lots.

Courts can order reformation of a deed if there is sufficient proof that the deed did not reflect the true agreement of the parties due to mutual mistake.  *Escamilla v. Estate of Escamilla*, 921 S.W.2d 723, 725 (Tex. App.—Corpus Christi 1996, writ denied); *see also Olson v. Bayland Pub., Inc.*, 781 S.W.2d 659, 663 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (right to reformation depends not on what mistake is made, but on strength of evidence of mutual mistake).  There must also be evidence of the true intention of the parties, and the reformation must conform to that agreement and not create an agreement that never existed.  *Continental Oil Co. v. Doornbos*,

---

[3] Wright swore that, aside from her home, she had $1,300 in cash, savings, and personal property, had $1,050 in debts, had monthly income (excluding $34 in food stamps) that matched her expenses of $563, and could not obtain credit for court costs.

Her current offer "to do equity and pay for reconveyance of the property" asserted in her brief does not affect whether the district court erred when rendering its judgment.

402 S.W.2d 879, 883 (Tex. 1966). In *Escamilla*, parents carved three one-acre tracts out of a twenty-acre tract, intending to give a vacant one-acre tract to each of their sons. *Escamilla*, 921 S.W.2d at 725. The parents mistakenly conveyed to one of their sons a tract of land that contained their house. *Id*. The appellate court found the evidence sufficient to support the finding of mutual mistake and upheld the trial court's reformation of the deed to convey a one-acre tract that did not include the parents' house. *Id*. at 726-28. There are factual and procedural differences between *Escamilla* and this case,[4] but they do not change the court's basic holding that a trial court may equitably reform a real-estate transaction to reflect the intention of the parties, even if the court must substitute an entirely different tract of land to effectuate the parties' actual intent. *Id*. at 726-27.

The district court did not err in its exercise of its equitable powers at the time of trial. The evidence, including Wright's affidavit of indigence, supports the implied finding that she did not have the money to fund rescission of the sale. Wright rejected replatting in open court; also, according to Winfred Baggett, replatting was also not an option because of Wright's refusal to pay back taxes. Forcing Lessard to pay for the house would have been harsh because she did not bargain to buy it; indeed, at trial she said she no longer wanted to live on the land. The forced purchase price

---

[4] There are factual differences in the actions of the parties that may have strengthened the equities in favor of reformation. There is an indication of fraud in *Escamilla* because the son who received the house provided to his parents the land description for the original deed knowing that it included the house and knowing they did not intend to convey the house to him. *Escamilla v. Estate of Escamilla*, 921 S.W.2d 723, 726 (Tex. App.—Corpus Christi 1996, writ denied). After her husband's death, Mrs. Escamilla attempted to repair their mistake by filing a correction deed in 1987. *Id*. at 727.

There are also procedural differences. The appellate court originally reversed the district court's judgment of reformation because no party had requested reformation; after the court remanded the cause in the interest of justice, the Estate repleaded and requested reformation. *Id*. at 725. The absence of a plea for reformation was not raised in this suit.

11

would have far exceeded the $7,800 she paid for the lot; the tax appraiser in 1998 valued the house at $29,200, while Wright, in her post-judgment affidavit of indigence, valued the house at $52,170.[5] Rather than forcing Lessard to relinquish Lot 104 for no compensation or forcing her to pay for a house she did not want, the court opted to order the parties to trade lots.[6]

Although Lot 105 was not exchanged in the underlying transactions, it has been integrally involved from the inception of the original transaction and throughout the suit. The mortgage company was set to foreclose on both Lot 104 and Lot 105 before the Baggetts paid Wright's debt. The original transaction was structured so that Wright would retain full title to Lot 105, the lot on which she, the Baggetts, and the tax appraiser believed her house was situated. In pleadings, both Wright and Lessard sought realignment of the boundary between Lot 104 and Lot 105 so that Wright could retain her house, but the lots would remain the same size. Although Wright then rejected the replatting option at the close of trial, she again seeks it as alternative relief on appeal. Thus, Lot 105, or a portion thereof, has been part of the transaction at every step of this case.

The judgment effectively reforms the original transaction to accomplish the intent of the parties to that transaction. Rather than imposing inequity on Wright, the judgment involving Lot 105 accomplishes the intent of the parties more effectively than the transaction as executed did or than simple rescission of the sale of Lot 104 would have at trial. Wright and the Baggetts intended

---

[5] Lessard's expressed interest in and valuation of the house varied. She offered to pay Wright $5,000 for it, depending on its condition, but demanded $1,000 in monthly rent for Wright's occupation of it.

[6] Although the court offered the parties two options and went along with Lessard's choice after Wright rejected both options, the court was not required to accept either the options or Lessard's choice. The court chose to accept Lessard's election.

the original transaction to stave off foreclosure of Wright's lots by extinguishing Wright's debt, to give the Baggetts some uninhabited property in exchange for that payment, and to allow Wright to continue to own her house and the land on which it sits. Winfred Baggett testified that he had no interest in owning the lot, but took the deed to ensure that he would have a means of recovering the money he paid in the event Wright could not pay him back.[7] Because of the mutual mistake over the location of the house, the original transaction transferred a house valued at almost $30,000 for nothing and left Wright homeless. By contrast, under the judgment, Wright has her house and the land on which it sits, as well as access without reliance on easements. Wright has a larger lot (2.01 acres versus 1.83 acres) with a greater valuation ($9,950 versus $9,060). The mortgage debt and taxes paid by the Baggetts remain paid. The judgment requires the transfer of Lot 105, however, to provide the compensation for the return of Lot 104 that Wright was unable to give at trial. Lessard, the successor to the Baggetts, holds the uninhabited Lot 105 unencumbered by easements. No party is unjustly enriched under the judgment as Wright would have been if the sale had been rescinded when she could not refund the purchase price or as Lessard would be if she got the house for free. No replatting is necessary under the judgment, although the tax lien will be on Lessard's property unless the taxing authorities agree as requested to transfer it to Lot 104 to follow Wright's ownership. The judgment requires Wright to move her barn and water pump in order to retain them,

---

[7] Winfred Baggett testified that at the time of the sale he told Wright, "We did not need the lot, did not want the lot, had no use for the lot and would hold the lot until at such point and time that we may need the money, and if I did need the money I would give her the right of first refusal and I would sell it back to her for exactly what I gave for it." He testified that he never walked the lot "because I wasn't in the business of buying a lot. That wasn't my purpose at all." This, plus the "purchase" price indicates that the Baggetts perhaps would have taken Lot 105 had they known that the house was on Lot 104.

but gives Wright the newly drilled water well for free. If anyone is disadvantaged by this solution, it is Lessard, and she chose this solution and does not challenge the judgment.

The district court's judgment is well-tailored to the peculiar facts of this case. The district court provided a fair and equitable resolution despite circumstances that foreclosed more conventional resolutions. We resolve the issues on appeal in favor of the judgment.

## CONCLUSION

The district court did not err by ordering the exchange of deeds to Lot 104 and Lot 105. The record supports finding that the Baggetts complied with their agreement to offer Wright the chance to buy the property back, and that Wright simply was not able to do so during the reasonable time period the offer was open. Although the sales of Lot 104 were tainted by mutual mistake, the district court did not err by failing to require simple rescission of the transfer of Lot 104 because Wright, according to her affidavit of indigence, was unable to refund the purchase price. The court's solution accomplishes the original intention of the parties, avoids unjustly enriching any party, and minimizes disruption to the property records of Comal County.

We affirm the judgment.

_____

Jan P. Patterson, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed:   May 30, 2003

14